# STATE OF CONNECTICUT *v.* KENNETH MARTIN SELLS
## (AC 27951)

Bishop, Beach and Mihalakos, Js.

Argued September 8, 2008—officially released February 24, 2009

*Michael O. Sheehan*, special public defender, with whom, on the brief, were *Cyd O. Oppenheimer* and *Richard A. Reeve*, special public defenders, for the appellant (defendant).

*Melissa L. Patterson*, deputy assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *David R. Shannon*, assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Kenneth Martin Sells, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), attempt to commit sexual assault in the first degree in violation of General Statutes § 53a-49 and 53a-70 (a) (1), and assault in the second degree in violation of General Statutes § 53a-60 (a) (1). On appeal, the defendant claims that the trial court improperly (1) allowed an expert medical witness to testify that the injuries suffered by the victim were "serious," (2) denied his motion to suppress evidence taken from his motor vehicle, which was seized without a warrant and without his consent, and (3) denied his *Batson*[1] challenge. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On January 7, 2005, Jane Doe, the victim,[2] had a

[1] See *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

washing machine delivered to her house by two men, one of whom was the defendant. Because the washer hoses on the old washing machine could not be disconnected from the supply lines, the new appliance was connected to the old hoses. An offer by the defendant to return and reconnect the hoses was declined by the victim.

In the early morning hours of January 15, 2005, the victim was awakened by her cat growling. She then heard her downstairs side door being opened followed a short time later by her cat's dish being kicked. She picked up her cordless telephone and dialed 911 several times, hanging up each time before speaking to anyone. Shortly thereafter, when she heard footsteps on her stairs, she picked up her flashlight. The victim then saw a head coming in her doorway and turned on her flashlight. Although she was not able to identify the defendant, the victim testified that her flashlight illuminated the face of the intruder.

Within one minute, the defendant picked up a chair and charged the victim. They grappled and she was thrown to the floor where she noticed the defendant wearing a black leather shoe with laces and a thick sole. She was then struck over the head with a red flashlight, and the defendant stomped on her back and face. This continued despite her pleas as to why he was doing this to her. Next, a bedsheet was wrapped around her head and neck and her pajama bottoms were ripped off. The defendant grabbed the victim by her hair, dragged her out of her bedroom and slammed her head against the wall in the hallway. He then dragged her into a bathroom and slammed her head into the side of the bathtub.

The defendant left the bathroom and shut the door, whereupon the victim started toward the window in an effort to escape. The defendant reentered the bathroom

and told her to stay away from the window. When the defendant again left the bathroom, the victim opened the window and saw three police officers below the window. The victim yelled to the officers that there was a man in her house. At that time, her face was bloodied and she was hysterical. The victim subsequently was able to exit the house through the window to safety. The defendant was not apprehended at the scene.

The victim was taken to a hospital where she was treated for blunt head trauma, a laceration and an orbital fracture of the left eye socket. While at the hospital, she informed the police officers of the washer delivery. On January 15, 2005, when the police processed the crime scene at the victim's home, they found a message on her answering machine in which the caller identified himself simply as Ken. They also found a red and black flashlight with the word "Sells" written on it, a Mets baseball hat, a fleece hat and a black cloth glove.

A DNA profile of the victim was consistent with the DNA profile found on the red flashlight. The victim was also a contributor to the DNA found on the Mets hat and the black glove. The defendant was a contributor to the DNA found on the fleece hat and the black glove. The victim testified that she had never seen the flashlight, hats or glove before the night she was attacked.

One officer responding to the 911 calls testified that while on the victim's street, he saw a car parked just a short distance from where the victim lived. Forensic tests later concluded that the car seen by the officer was the defendant's 1995 Buick LeSabre. A state criminalist testified that a subsequent inspection of the defendant's vehicle revealed that the scrapings of the underside of the car matched paint on a stone found in a tire track near the victim's house. A pair of black leather shoes were also seized from the trunk of the defendant's car. DNA of the blood found on the shoelace of one of the

shoes seized from the trunk was consistent with the victim's DNA profile.

After a trial to the jury, the defendant was convicted of burglary in the first degree, attempt to commit sexual assault in the first degree and assault in the second degree. He was sentenced to a term of thirty-five years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant's first claim is that the court abused its discretion by allowing the emergency room physician, Jose Pinero, to testify that the victim's injuries were "serious in nature . . . ."[3] The defendant argues that

[3] The following colloquy took place between the prosecutor and Pinero:

"[The Prosecutor]: [D]o you have an independent recollection of treating [the victim] or what she looked like?

"[The Witness]: Yes. Basically, she was pretty frazzled and upset when she initially arrived.

"[The Prosecutor]: What did she look like—did you examine her?

"[The Witness]: Yes, I did.

"[The Prosecutor]: What injuries did you note, if any?

"[The Witness]: She has several injuries. Most significantly, she had a lot of swelling to the left side of her face, which was already bruising up. She could still open up her left eye. She also had a cut, a laceration, to the left posterior part of her scalp, about an inch long, that was bleeding. There was blood in her left ear as well. Those are the ones that stand out the most. She had a couple of other scrapes, multiple scratches were on her forehead and face and scalp.

"[The Prosecutor]: Okay. And, in regard to the injury to the back of her head, the laceration, that was bleeding when you treated her?

"[The Witness]: Yes.

"[The Prosecutor]: How was that treated?

"[The Witness]: That needed to be stapled shut.

"[The Prosecutor]: How many staples did it take to staple that shut?

"[The Witness]: Five.

"[The Prosecutor]: Is that the type of wound that, based on your training and experience, you—you would expect to scar?

"[The Witness]: Yes.

"[The Prosecutor]: And, were any X rays or CAT [computerized axial tomography] scans done of the victim's head or body?

"[The Witness]: We had multiple X rays and because of the nature of the head trauma, with the blood in the ear and the swelling to the face, we did

to find him guilty of assault in the second degree, the jury would have had to find that the victim's injuries were "serious," which is an ultimate question of fact. When Pinero testified that the victim's injuries were "serious," he went beyond the scope of permissible testimony and instead opined as to an ultimate question of fact, which is for the jury to decide. The defendant claims that Pinero's testimony, therefore, harmed the defendant by substantially swaying the jury's verdict.

We agree with the defendant that Pinero's testimony concerning the serious nature of the victim's injuries went beyond the scope of permissible testimony in that Pinero's opinion was on an ultimate question of fact, which can be decided only by the jury. See *State* v. *Smith*, 35 Conn. App. 51, 70, 644 A.2d 923 (1994) ("[a]n

---

get a CAT scan of her head, which did reveal that she had a fracture to the floor of the left orbit of the eye.

"[The Prosecutor]: Now, that floor, what is that composed of, what was fractured, presumably?

"[The Witness]: It's—the floor of the orbit is thin bone and that can be fractured with any blunt trauma, such as having someone's head and bashing it up against a wall or tub or being punched can also fracture that. She did not, fortunately, have entrapment, sometimes, the eye muscles get stuck and, in which case, she would need surgery to fix that. Fortunately, she didn't have that.

"[The Prosecutor]: Was—is it the type of injury that could lead to an eye being recessed within the eye socket by millimeters?

"[The Witness]: Oh, yes, it could cause problems looking in certain directions.

"[The Prosecutor]: And, based on your training and experience as sixteen years as an emergency room doctor, are these types of injuries that would be consistent with being punched or being kicked?

"[The Witness]: Yes.

"[The Prosecutor]: Ultimately, what was the diagnosis of this patient?

"[The Witness]: It was, basically, blunt head trauma, she had a laceration and she had an orbital floor fracture of her left eye.

"[The Prosecutor]: Did she—was she in any dis—discomfort at all?

"[The Witness]: She was uncomfortable. She had enough swelling and injuries that, yeah, she was quite uncomfortable.

"[The Prosecutor]: Doctor, based on your experience, would you consider these injuries serious in nature?

"[The Witness]: Yeah. Yes."

expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the trier of fact" [internal quotation marks omitted]). We do not agree, however, that the testimony harmed the defendant. The standard for determining whether an erroneous evidentiary ruling is harmful is "whether the jury's verdict was substantially swayed by the error." *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006) (en banc). Such an error "is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." *State* v. *Randolph*, 284 Conn. 328, 363, 933 A.2d 1158 (2007). "[W]hether [the improper admission of evidence] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative . . . the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) Id., 364.

The defendant admits that the victim's injuries were physical injuries but argues that the seriousness of the injuries was debatable and for the jury alone to decide. He claims, therefore, that Pinero's specific testimony that the victim's injuries were serious in nature substantially swayed the jury to conclude that the physical injuries sustained by the victim were in fact serious. The defendant's argument, however, is unavailing. Pinero was only one of two witnesses that testified as to the extent of the victim's injuries. The victim testified that she suffered a fractured orbital floor, which caused her eye to recede into her eye socket and continued to cause her numbness around her eye and cheekbone. She further testified that she had had four or five

stitches in the back of her head and that at the time of the trial, she still suffered pain in her left shoulder and left arm. Pinero's testimony as to the extent of the victim's injuries was cumulative of the victim's testimony. Pinero testified that the victim suffered from swelling to the left side of her face, an inch long laceration at the back of her head that was bleeding and needed five staples to close, blood in her left ear and an orbital floor fracture to her left eye. Moreover, the defendant did not object to any of the graphic testimony given by Pinero. There was overwhelming evidence presented by both the victim and Pinero as to the victim's injuries from which the jury reasonably could have found that the victim incurred "serious physical injury . . . ." We conclude, therefore, that the error was harmless.

## II

The defendant next claims that the court improperly denied his motion to suppress the black leather Skechers brand shoes taken from the trunk of his car pursuant to a search warrant. The seizure of the car, however, was warrantless. The defendant concedes that there was probable cause to seize the car; nonetheless, he claims that his fourth amendment rights were violated because the car was not readily mobile at the time it was seized and that he had an enhanced expectation of privacy because he told the police that he was living in the car. The court denied the defendant's motion. The following additional facts are necessary to our resolution of the defendant's claim.

Prior to the hearing on the motion to suppress, the parties stipulated that the department of motor vehicles listed the defendant's address as 450 Overland Drive in Stratford. On January 15, 2005, the defendant drove the car into the driveway at 450 Overland Drive. Subsequently, the defendant voluntarily accompanied a police

officer to the police station for questioning and upon the defendant's return to 450 Overland Drive, the car was seized by the police without a warrant. It was agreed that the police had probable cause to obtain a warrant to seize the car.[4]

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Hall*, 110 Conn. App. 41, 50, 954 A.2d 213 (2008).

In the present matter, we agree with the court's well reasoned decision filed May 4, 2006, and conclude that the court properly denied the motion to suppress.

### III

The defendant's final claim is that the court improperly denied his challenge to the state's peremptory strike of the only African-American venireperson. The following facts are necessary to our resolution of the defendant's claim.

During the course of jury selection, the state exercised a peremptory challenge against C.[5] The defendant and C are both African-American. The defense raised a *Batson* challenge. The prosecutor responded that he

---

[4] The court's memorandum of decision on the motion to suppress states that the defendant did not contest the existence of probable case at the hearing. The court, in any event, found that the stipulated facts established probable cause.

[5] To protect the privacy of the juror, we decline to identify the juror by name. See *State* v. *Beavers*, 99 Conn. App. 183, 193 n.5, 912 A.2d 1105, cert. denied, 281 Conn. 925, 918 A.2d 276 (2007).

was exercising his challenge on two grounds: (1) C had served one year in prison for a failure to appear conviction and (2) C was related to Marliek Mourning, whom the prosecutor previously had prosecuted. The underlying charge for the failure to appear conviction was for a misdemeanor charge of sixth degree larceny that had occurred more than seven years prior to this trial. During questioning, however, C stated that he believed that the court had treated him fairly and, further, that he had been unaware of the prosecution of Mourning. The court, while noting that C was the only African-American venireperson, denied the *Batson* challenge because there was no evidence of any pattern of discrimination shown and that legitimate reasons for excluding C had been shown.

We are bound to follow the dictate of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), in determining whether the jury was selected in a racially discriminatory manner. "In *Batson* . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . [T]he Equal Protection Clause [of the fourteenth amendment] forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." (Internal quotation marks omitted.) *State* v. *Monroe*, 98 Conn. App. 588, 590–91, 910 A.2d 229 (2006), cert. denied, 281 Conn. 909, 916 A.2d 53 (2007).

"Discrimination in the selection of a jury . . . harms the litigants, the excluded jurors, and the community." *Martins* v. *Connecticut Light & Power Co.*, 35 Conn. App. 212, 224, 645 A.2d 557, cert. denied, 231 Conn. 915, 648 A.2d 154 (1994). "Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party]

must advance a neutral explanation for the venire-person's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination." (Internal quotation marks omitted.) *State* v. *Monroe*, supra, 98 Conn. App. 591. "[T]he trial court's decision on the question of discriminatory intent represents a finding of fact . . . . Accordingly, a . . . court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous." (Internal quotation marks omitted.) Id., 592. "Nonetheless, because of the constitutional implications of the alleged defects in the jury selection process, in reviewing the defendant's claims under the state constitution, we will subject the findings of the trial court to the same independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding . . . . We invoke that heightened review, however, within the broader context of the clearly erroneous standard." (Citations omitted; internal quotation marks omitted.) *State* v. *Morales*, 71 Conn. App. 790, 802–803, 804 A.2d 902, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002).

As noted, after the defendant asserted his *Batson* claim, the state responded with two reasons for its peremptory challenge, which the court found to be race neutral. At that point, the burden of persuasion rested on the defense to demonstrate to the court that the state purposefully discriminated against this potential

juror. *State* v. *Hamlett*, 105 Conn. App. 862, 878, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008).

The defendant argues that neither of the reasons articulated by the state in support of its excusal was sufficient to overcome the *Batson* challenge. First, the defendant argues that the state failed to elaborate why the failure to appear conviction rendered C unqualified. Second, the defendant argues that there was no record that Mourning, who had been prosecuted by the prosecutor, was in fact a close relative of C. The defendant further argues that although there may have been a familial relationship, C hardly knew Mourning and knew nothing of his prosecution. The defendant concludes, therefore, that both reasons offered by the state were clearly pretextual. We disagree. "[A]n arrest record . . . constitutes a neutral ground for the state's exercise of a peremptory challenge to excuse a black venireperson." *State* v. *Smith*, 222 Conn. 1, 14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). Further, use of a peremptory challenge of a venireperson who has a family member whom he believes has been treated unfairly by the police is a race neutral ground for exercising the challenge. *State* v. *Jackson*, 95 Conn. App. 400, 409–10, 896 A.2d 137, cert. denied, 279 Conn. 904, 901 A.2d 1226 (2006).

We cannot say, in light of C's conviction for failure to appear on an underlying misdemeanor charge of sixth degree larceny and his relation to a person whom the prosecutor personally prosecuted, that the prosecutor's concern that the venireperson might harbor ill will toward the state was a pretext for excusing C for a prohibited reason. Although C stated that he felt no ill will against the state or the court system, a "prosecutor is not bound to accept the venireperson's reassurances, but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters." (Internal

quotation marks omitted.) *State* v. *Hamlett,* supra, 105 Conn. App. 879.

We conclude that the court's rejection of the defendant's *Batson* challenge was not clearly erroneous. See *State* v. *Monroe,* supra, 98 Conn. App. 592; *State* v. *Morales,* supra, 71 Conn. App. 802. "[T]he fact-bound determination concerning the propriety of the use of peremptory challenges is a matter that necessarily must be entrusted to the sound judgment of the trial court, which, unlike an appellate court, can observe the attorney and the venireperson and assess the attorney's proffered reasons in light of all the relevant circumstances." *State* v. *Hodge,* 248 Conn. 207, 261, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). Here, the court determined that the reasons offered by the prosecutor for striking C were race neutral and not pretextual. See *State* v. *Monroe,* supra, 596. We conclude that the court properly determined that the state had not exercised its peremptory challenge in a racially discriminatory manner.

The judgment is affirmed.

In this opinion the other judges concurred.