## STATE OF CONNECTICUT *v.* MICHAEL MYERS
### (AC 32026)

Bishop, Beach and West, Js.

Argued November 9, 2010—officially released January 25, 2011

*James B. Streeto,* assistant public defender, for the appellant (defendant).

*Harry Weller,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's

attorney, and *Kevin Doyle*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Michael Myers, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55a and 53a-55 (a) (1), carrying a pistol without a permit in violation of General Statutes § 29-35, tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1) and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). On appeal, the defendant claims that the trial court improperly (1) failed to admit a defense witness' statement into evidence under the spontaneous utterance exception to the hearsay rule, (2) denied the defendant access to mental health records of a state's witness following in camera review, (3) admitted a photograph of the victim into evidence, (4) instructed the jury that evidence of motive was "desirable and important," and (5) denied his *Batson*[1] challenge during jury selection.[2] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant had a tempestuous relationship with Shaquita Alston, the mother of his child. On the night of June 2 and the early morning of June 3, 2005, Alston met the victim, William Corey, at a nightclub in New Haven, after which they had sexual relations at his apartment. Corey then drove her back to her residence,

---

[1] See *Batson* v. *Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[2] The defendant also claims that the court improperly denied his motion for rectification of a gap in the voir dire transcript of one of the jurors. Because we determine that his *Batson* claim of disparate treatment of venirepersons during jury selection was not preserved, there is no need for the missing transcript, and we need not address the claim.

where they found the defendant waiting outside. The defendant advised Corey that he would talk to him later.

Over the next two days, the defendant argued with Alston, accusing her of having sexual relations with Corey, which she denied. Subsequently, in the early morning of June 5, 2005, she physically attacked the defendant when she saw him with another woman at his house. On the night of June 6, 2005, the defendant and Alston spent time together at his house, during which he telephoned Corey and arranged a meeting. He took a handgun with him when he and Alston left the house.

The defendant and Alston walked to meet Corey, who was waiting in his car. Both got into Corey's car, which he then drove around New Haven, at which time the defendant asked questions about what had transpired between Corey and Alston on the morning of June 3. During this time, the defendant also telephoned a friend of Alston who had left the club with her and Corey on June 3. At some point, the defendant directed Corey to stop the car and exited on the passenger side after Alston. Standing outside the car, he fired one gunshot into Corey and ran from the scene. Corey died of internal bleeding caused by the single gunshot wound.

The defendant subsequently was arrested and charged with murder in violation of General Statutes § 53a-54a (a), carrying a pistol without a permit in violation of § 29-35, tampering with physical evidence in violation of § 53a-155 (a) (1) and criminal possession of a firearm in violation of § 53a-217 (a) (1). After a jury trial, the defendant was convicted of the lesser included offense of manslaughter in the first degree with a firearm in violation of §§ 53a-55a and 53a-55 (a) (1), carrying a pistol without a permit, tampering with physical evidence and criminal possession of a firearm. The court imposed a total effective sentence of fifty

years incarceration. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim is that the court improperly failed to admit a witness' statement into evidence under the spontaneous utterance exception to the hearsay rule.[3] He also argues, in the alternative, that the statement should have been admitted under the residual exception. We are not persuaded.

The following additional facts and procedural history are relevant to this claim. The defendant decided not to testify at his trial, but his recorded statement to the police of June 9, 2005, was in evidence. In that statement, he told the police that, after shooting Corey, he told "some lady outside" to call the police because "somebody been shot." During the trial, the defendant sought to introduce the testimony of Sabrina Brown regarding that statement, and the state filed a motion in limine to preclude it. In an offer of proof, Brown testified that she lived close to the crime scene and knew the defendant. She testified that on June 6, 2005, he knocked on her door and stated his name, and, when she opened the door, he asked if she could call 911 because someone was hurt. She described his demeanor at the time as "[l]ike hi[m]self really. Flat. . . . Soft spoken." She also testified that the police arrived "five to ten minutes" after the defendant left her front door.

The defendant argued that Brown's testimony that the defendant asked her to call 911 was relevant to demonstrate that he lacked the intent to cause Corey's

---

[3] In his brief, the defendant requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Because he properly preserved the claim at trial pursuant to Practice Book § 60-5, we need not engage in *Golding* analysis, as he suggests.

death and was admissible under the spontaneous utterance and residual exceptions to the hearsay rule. The court found that the defendant's statement was not a spontaneous utterance because, when he made it, he did not appear to be under the influence of a startling event and he had had the time and motive to fabricate the self-serving statement. For the same reasons, the court found that the statement lacked the requisite reliability to be admitted under the residual exception.

"The excited utterance exception is well established. Hearsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrication by the declarant. . . . Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge. . . . The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion." (Internal quotation marks omitted.) *State* v. *Kendall*, 123 Conn. App. 625, 666, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010); see also Conn. Code Evid. § 8-3 (2).

Our Supreme Court first recognized the spontaneous utterance exception in *Perry* v. *Haritos*, 100 Conn. 476, 124 A. 44 (1924), and listed the following elements to guide the trial court's factual determination: "The element of time, the circumstances and manner of the accident, the mental and physical condition of the declarant, the shock produced, the nature of the utterance, whether against the interest of the declarant or not, or made in response to question, or involuntary,

and any other material facts in the surrounding circumstances, are to be weighed in ascertaining the basic conclusion whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation." Id., 484. With regard to the element of time, "there is no identifiable discrete time interval within which an utterance becomes spontaneous; [e]ach case must be decided on its particular circumstances." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 375, 908 A.2d 506 (2006).

None of Brown's testimony tends to establish that the defendant's statement was spontaneous and uncontrived. Her testimony gave no indication that the defendant was under the influence of a startling event but, rather, described him as "[f]lat" and "[l]ike hi[m]self." She also indicated that time had elapsed between the incident and the statement. Although the time interval appears to have been short, given Brown's testimony that the statement occurred before the police arrived, the time span between the shooting and the defendant's arrival at Brown's residence was not so close in time as to negate the opportunity for deliberation. Moreover, given that the statement was unsolicited and self-serving, not a single element of the defendant's offer of proof clearly indicated that the statement was reliable. The court, therefore, did not abuse its discretion in concluding that the statement was inadmissible under the spontaneous utterance exception.

Likewise, the court did not abuse its discretion in determining that the statement was not admissible under the residual exception to the hearsay rule. "A hearsay statement that does not fall within one of the traditional exceptions to the hearsay rule nevertheless may be admissible under the residual exception to the hearsay rule provided that the proponent's use of the statement is reasonably necessary and the statement

itself is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule." (Internal quotation marks omitted.) *State v. Faison*, 112 Conn. App. 373, 383–84, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009); see also Conn. Code Evid. § 8-9. "A court's conclusion as to whether certain hearsay statements bear the requisite indicia of trustworthiness and reliability necessary for admission under the residual exception to the hearsay rule is reviewed for an abuse of discretion." *State v. Faison*, supra, 384. Given the lack of indicia of reliability noted above, the court did not abuse its discretion in declining to admit the statement under the residual hearsay exception.

## II

We next address the defendant's claim that the court improperly failed to disclose materials relevant for cross-examination that were contained in Alston's mental health records, which the court had reviewed in camera. We disagree.

The following additional procedural history is relevant to this claim. On April 4, 2008, the defendant filed a motion for in camera review of Alston's sealed medical, mental health, substance abuse and parenting evaluation records.[4] The motion requested the disclosure of information relevant to her ability to comprehend, know or correctly relate the truth; her reliability, credibility, and ability to testify truthfully; and her sense of perception. She consented to the in camera review. Upon inspecting the records, the court determined that only one page was relevant to her testimonial capacity. The court disclosed that document to the defendant

---

[4] These included records subpoenaed from the department of children and families, the Grant Street Partnership, the Hospital of Saint Raphael and the Yale Child Study Center.

after the state had obtained Alston's consent to do so. The court also determined that the remainder of the documents were not relevant to her capacity to testify and ordered that they be sealed as a court exhibit and preserved for appellate review.

"It is well established that [a] criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. . . . Thus, in some instances, otherwise privileged records . . . must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility. . . .

"We are mindful, however, that the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The need to balance a witness' statutory privilege to keep psychiatric records confidential against a defendant's rights under the confrontation clause is well recognized. . . . The test and the associated burdens imposed on a defendant are equally well chronicled. If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness. . . . If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera. A witness'

refusal to consent to such an in camera inspection entitles the defendant to have the witness' testimony stricken. . . .

"Upon inspecting the records in camera, the trial court must determine whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences. . . . If the court determines that the records are probative, the state must obtain the witness' further waiver of his privilege concerning the relevant portions of the records for release to the defendant, or have the witness' testimony stricken. If the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review. . . . Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused." (Citations omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 379–81, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

Our review of Alston's records satisfies us that the sealed records either were not relevant to Alston's capacity to observe, recollect or narrate the events surrounding the shooting or were cumulative of the record that the court disclosed to the defendant. Accordingly, the court did not abuse its discretion in not disclosing them to the defendant.

### III

We turn next to the defendant's claim that the court improperly admitted into evidence a photograph of Corey taken prior to the date of the offense and permitted an enlarged version to be displayed during the state's closing argument. We are not persuaded.

The following additional procedural history is relevant to this claim. During trial, the court admitted as a full exhibit a studio portrait, measuring five inches by seven inches, of Corey wearing a shirt and tie taken prior to the date of his death. The state offered the photograph to assist in its identification of Corey and suggested General Statutes § 54-85e[5] as a legal basis for its admissibility. The defendant objected on the ground that § 54-85e provides for a display of a photograph during opening and closing arguments but does not provide for its admission as an exhibit. The court admitted the photograph, instead, under the rules of evidence on the basis of its relevance to the state's burden to prove that a person was killed and to identify that person, stating that the "permissive use" of a photograph not in evidence provided in § 54-85e does not preclude the admission of a photograph under the rules of evidence. The court also noted that the photograph was "of the proper size, not inflammatory, and a fair and accurate representation"[6] of Corey. Following closing argument, during which the state again displayed the photograph, this time by a means of projection,[7] the defendant objected that it had been enlarged to approximately four feet by two feet, exceeding the size permitted by § 54-85e. The court noted the objection and stated

[5] General Statutes § 54-85e provides: "A photograph not to exceed eight inches by ten inches solely of a deceased victim prior to the date of the offense for which the defendant is being tried, that is a fair and accurate representation of the victim and is not of itself inflammatory in nature, may be shown to the jury during the opening and closing arguments by the prosecutor."

[6] In commenting on the "proper size" of the photograph, the court seems to have been referring to the size restrictions provided in § 54-85e. We do not interpret this as a suggestion by the court that § 54-85e governs the admission of a photograph into evidence, given that the court simultaneously distinguished the statute from the rules of evidence. Rather, we view the comment as surplusage.

[7] The photograph appears to have been projected on a screen during the state's closing argument. The record reveals that the state had used a projector as an aid in presenting its case.

for the record that the display was not inflammatory or prejudicial; the photograph was displayed momentarily, then taken off; and neither § 54-85e nor "anything else" precluded the state's use of the photograph.

On appeal, the defendant contends that because such a photograph likely inflames the emotions of the jury in a death related case, the legislature provided § 54-85e as the exclusive means for the presentation of an image of a deceased victim taken prior to the date of the offense. Because this claim entails statutory interpretation, our review is plenary. *In re A.R.*, 123 Conn. App. 336, 339, 1 A.3d 1184 (2010). "In construing [a statute], we are mindful of General Statutes § 1-2z, which instructs us that [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that [intent and the meaning of a statute] . . . § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Bank of New York* v. *Bell*, 120 Conn. App. 837, 845, 993 A.2d 1022, cert. denied, 298 Conn. 917, 4 A.3d 1225 (2010).

In the case of § 54-85e, we need not look beyond the language of the statute because its language is clear and unambiguous. The statute pertains only to the non-evidentiary presentation of an image of a deceased victim and contains no restriction on the admission into evidence of a photograph of a deceased victim. Nor does it expressly abrogate or seek to supplant the rules

of evidence adopted by the judiciary. The statute provides that such a photograph of a certain maximum size "may be shown to the jury during the opening and closing arguments by the prosecutor." General Statutes § 54-85e. Because the state's opening statement precedes the presentation of evidence, a photograph displayed during the opening unquestionably is not in evidence. The statute, therefore, unambiguously pertains to the nonevidentiary presentation of an image of a deceased victim.

Consequently, the size restrictions provided in § 54-85e are inapplicable to the photograph at issue, which the court properly determined, in its discretion, to be admissible as a full evidentiary exhibit. "[O]ur Supreme Court consistently has held that the trial court's determination on the admissibility of photographic evidence, including videotapes, will not be disturbed unless the trial court has abused its discretion. . . . [P]hotographic evidence is admissible where the photograph has a reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry. . . . Therefore, it is not necessary to show that the photographic evidence is essential to the case in order for it to be admissible. . . . In determining whether photographic evidence is admissible, the appropriate test is relevance, not necessity." (Internal quotation marks omitted.) *State* v. *Ervin*, 105 Conn. App. 34, 38–39, 936 A.2d 290 (2007), cert. denied, 285 Conn. 918, 943 A.2d 475 (2008). Additionally, with regard to the admissibility of an allegedly inflammatory photograph, "a trial court has broad discretion in weighing the potential prejudicial effect of a photograph against its probative value." (Internal quotation marks omitted.) *State* v. *Bowman*, 289 Conn. 809, 820, 960 A.2d 1027 (2008). Likewise, the decision to allow enlarged photographs to be displayed rests in the sound discretion of the trial court. See, e.g., *State* v. *Parsons*, 28 Conn. App. 91, 107, 612 A.2d 73 (enlargements added

evidentiary value and shed light on material inquiry because they allowed jury to see photographs better), cert. denied, 223 Conn. 920, 614 A.2d 829 (1992).

Here, the court did not abuse its discretion in finding that this unremarkable photograph of Corey was not inflammatory and was relevant to identifying him. Nor, for the same reasons, did the court abuse its discretion in admitting the photograph as a full exhibit and permitting the state to display briefly an enlarged version of the exhibit during closing argument. Accordingly, the claim fails.

IV

We next address the defendant's claim that the court improperly instructed the jury that evidence of motive was "desirable and important." We are not persuaded.

The following additional procedural history is relevant to this claim. In his supplemental request to charge of April 21, 2008, the defendant objected to any characterization of motive evidence as "desirable" or "important," arguing that this language had been used in appellate analysis but never explicitly approved for use in a jury charge. In its instructions to the jury, the court nevertheless stated: "While motive is not an element of the crimes charged, such evidence is both desirable and important . . . ."[8] Subsequently, the defendant repeated his objection for the record.

---

[8] The court's instruction on motive was as follows: "I'm going to talk a bit about motive. Motive is not an element of any crime, and, therefore, the state is not required to prove any motive to you. While motive is not an element of the crimes charged, such evidence is both desirable and important, as it may strengthen the state's case if an adequate motive can be shown. . . . Therefore, an absence of evidence of motive may tend to raise a reasonable doubt of the guilt of the defendant, but a total lack of evidence of motive does not necessarily raise a reasonable doubt as long as there is other evidence produced that is sufficient to prove all the elements of a crime beyond a reasonable doubt. Conversely, proof of motive does not relieve the state from the burden of proving all the elements of a crime.

"In this case, on the issue of motive, the state offered evidence that the defendant believed that Shaquita Alston had been intimate with William

We begin with the applicable standard of review for a claim of instructional error. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Dougherty*, 123 Conn. App. 872, 885, 3 A.3d 208, cert. denied, 299 Conn. 901, 10 A.3d 521 (2010). Additionally, "[w]hile a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a court need not tailor its charge to the precise letter of such a request. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the

Corey. You may consider such evidence if you believe it and further find [that] it logically, rationally and conclusively supports that the defendant had a motive to commit the crimes charged. On the other hand, if you do not believe such evidence or, even if you do, if you find that it does not logically, rationally and conclusively support the claim that [the defendant] had a motive to commit the crimes charged, then you may not consider that testimony for any purpose at all. You cannot use it for any other purpose. You can accept it or reject it just like any other evidence. By allowing it in gives it no special weight. A jury should examine the conduct of an accused in the light of the surrounding circumstances, and, knowing how the human mind ordinarily operates, the jury should try to determine whether on all of the evidence it can reasonably be inferred that the defendant had a motive to commit the crimes in accordance with the rule of circumstantial evidence I have already given you. If the existence of a motive can be found, that may be evidence of guilt; on the other hand, if no motive can be found, that may tend to raise a reasonable doubt as to the guilt of the defendant. Whether a motive can be found in this case is the determination that you should make and, thereafter, decide upon the weight such a motive or absence thereof should have, if any."

The court also noted that the jury's consideration of motive applied only to the charges of murder and carrying a pistol without a permit.

instructions as improper." (Citations omitted; internal quotation marks omitted.) *State* v. *Aviles*, 277 Conn. 281, 309–10, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). For nonconstitutional claims, if a jury instruction is determined to have been improper, it is grounds for reversal only if it is reasonably probable that the jury was misled. Id., 310.

The defendant contends that the jury instruction improperly weighed the evidence of motive, taking from the jurors the free exercise of their judgment in contravention of *State* v. *Rome*, 64 Conn. 329, 338, 30 A. 57 (1894) ("[t]he jurors are the sole judges of the credibility of the witnesses, the weight of evidence, and the facts that it establishes; and any form of charge, the effect whereof is to take these from them, or to obstruct the free exercise of their judgment in passing upon these, is erroneous" [internal quotation marks omitted]). Placing the allegedly improper language in the context of the entire charge, however, the record reveals that the court did not invade the province of the jury. "The trial court may, at its discretion, call the attention of the jury to the evidence, or lack of evidence, bearing upon any point in issue and may comment upon the weight of the evidence so long as it does not direct or advise the jury how to decide the matter." (Internal quotation marks omitted.) *State* v. *Bardliving*, 109 Conn. App. 238, 242, 951 A.2d 615, cert. denied, 289 Conn. 924, 958 A.2d 153 (2008).

Here, the court twice stated that the evidence could be weighed either way: the existence of motive may be evidence of guilt, but the lack of motive may tend to raise a reasonable doubt. Calling the jury's attention to the state's offer of evidence suggesting that the defendant believed that Alston had been intimate with Corey, the court commented that the jury did not have to believe or accept the evidence and emphasized that it was the jury's task to weigh the importance, "if any,"

of such a motive or the absence thereof. The overall instruction provided the jury with balanced and appropriate guidance on that issue and did not weigh the evidence in favor of either party. See, e.g., *State* v. *Francis*, 90 Conn. App. 676, 688–89, 879 A.2d 457 (approving similar instruction as balanced and fair), cert. denied, 275 Conn. 925, 883 A.2d 1248 (2005). Viewed within the context of the entire charge, the court's characterization of motive evidence as desirable and important was not improper.

V

We turn next to the defendant's claim that the court improperly denied his *Batson* challenge to the prosecutor's peremptory strike of D,[9] an African-American venireperson, during jury selection. In this regard, the defendant makes two distinct claims: (1) the state's acceptance of other venirepersons who were similarly situated to D indicates that D's dismissal was race based and (2) the reasons articulated by the prosecutor for striking D were insufficient and pretextual. We are not persuaded.

The principles of law and standard of review applicable to this claim are well established. "In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason

---

[9] References to venirepersons will be made by use of initials to protect their legitimate privacy interests. See, e.g., *State* v. *Holloway*, 116 Conn. App. 818, 822 n.4, 977 A.2d 750 (2009).

is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the

[party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. . . . As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Holloway*, 116 Conn. App. 818, 822–24, 977 A.2d 750, cert. denied, 294 Conn. 902, 982 A.2d 646 (2009).

During voir dire, the prosecutor and defense counsel both questioned D. In response to the prosecutor's questions, D revealed that he had been arrested by the New Haven police nineteen years earlier but believed that he had been treated fairly because he was innocent and

the case had been nolled. He indicated that he did not harbor any bias against the criminal justice system or against police officers. In response to defense counsel's questions, D revealed that his son had been prosecuted and convicted in the Milford court for armed robbery and was serving a twenty year sentence. He stated that he writes to his son but that his son does not write back. He also stated that his son's situation would not affect his impartiality because his son was a grown man and has to live with his decisions. D also revealed that, when he was a young adult in Texas, he "used to run with a pimp" and once had carried a gun but had not used it.[10] He noted, "When I did that, I was young, and I've never like[d] it then, I don't like it now." He also indicated that he had turned his life around since his "wild" youth.

After D's voir dire, the prosecutor exercised a peremptory challenge to excuse D, and defense counsel raised a *Batson* objection. The prosecutor articulated three race neutral reasons for exercising his challenge: (1) similar to the defendant, D had been arrested by the New Haven police; (2) his son had been prosecuted by the Milford state's attorney's office, and the prosecutor disclosed that he had formerly worked at that office; and (3) because of D's stated wild youth, there was a possibility that he would empathize with the defendant's circumstances despite his promises of impartiality. Defense counsel responded that these reasons were insufficient because D stated that he was not biased as a result of these experiences, and he demonstrated that

---

[10] D stated the following: "When I was in Texas about sixteen years ago, I used to run with a pimp. All right. And we was at a club and one of his girls came in, and this guy was trying to run him over downtown, so we ran over with the pimp's girl downtown. . . . So, then we went to the car, we popped the trunk and started pulling out guns. Well, I'm petrified, you know, so we riding and I'm praying that we never run up on this person. . . . And we never did."

he was thoughtful, candid, aware of a juror's responsibilities, and committed to being impartial. The court found that D's experiences created a risk that he might empathize with the defendant and also found that the state had not engaged in a pattern of questioning him that was different from its treatment of other venirepersons. It concluded that there was nothing to suggest that the prosecutor had a race based ulterior motive in exercising a peremptory challenge to excuse D.

## A

We first address the defendant's claim that D received disparate treatment from the state as compared with other venirepersons, which, in turn, provides support for his argument that the state's proffered explanation for striking D was pretextual. To substantiate his claim, the defendant compares the state's treatment of D to its treatment of two accepted jurors, C and F, and two venirepersons, V and L, who were accepted by the state before they were dismissed by the defendant. The state contends, however, that these " 'additional facts' " are not part of the record for review because they were not before the court at the time that it made its finding on the defendant's *Batson* challenge. The voir dire of C occurred on March 6; the *Batson* challenge regarding D occurred on March 7; and the voir dire of the other three took place on March 17 and 20, 2008.

Our Supreme Court has set a bright line rule that a *Batson* challenge is timely if the defendant raises it at any time before the jury is sworn. *State* v. *Robinson*, 237 Conn. 238, 245–50, 676 A.2d 384 (1996). The court noted in *Robinson* that to make a claim of disparate treatment, the defense would need to compare the prosecutor's treatment of venirepersons throughout the process of jury selection; hence, the extension of time to make a challenge. Id., 249–50. It also noted, however, that any *Batson* claim not timely raised is deemed to

have been waived. Id., 245–46, 250. "Timely objection enables the parties and the trial court (1) to preserve an adequate record for appeal, and (2) to avoid prejudicial error by permitting reconsideration while it is still possible." Id., 252.

The court subsequently applied this rule in *State* v. *Hodge*, 248 Conn. 207, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). In *Hodge*, the defendant asked the trial court to compare the voir dire of six other venirepersons to the voir dire of the minority venireperson who was struck. Id., 227–28. Our Supreme Court held that the disparate treatment claim was unpreserved as to three of the venire-comparators because their voir dire had taken place subsequent to the defendant's *Batson* challenge, which he had not renewed after viewing their voir dire. Id. It concluded that "[b]ecause a disparate treatment claim raises factual questions that must be decided by the trial court, the defendant's failure to raise the claim in the trial court is fatal to his claim on appeal." Id., 228. Accordingly, in *State* v. *Jackson*, 95 Conn. App. 400, 410–14, 896 A.2d 137, cert. denied, 279 Conn. 904, 901 A.2d 1226 (2006), we declined to review a claim that the trial court should have reconsidered its denials of three prior *Batson* challenges after it sustained a *Batson* challenge as to a fourth venireperson, stating that "[d]efense counsel was obligated to make known to the court his new claim under *Batson*, which was predicated on additional facts that were unavailable at the time the court made its prior rulings."[11] Id., 413;

[11] The defendant mistakenly asserts in his reply brief that the foregoing precedents are inapt in the present case because they pertain to the review of claims raised pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). *Robinson*, in fact, makes no mention of *Golding*. See *State* v. *Robinson*, supra, 237 Conn. 238. Likewise, *Golding* review was not at issue in *Hodge* and *Jackson*. Instead, those opinions cited *Golding* simply for the rule that an appellate court will not supply a predicate factual determination where the defendant did not ask the trial court to make one. See *State* v. *Hodge*, supra, 248 Conn. 227; *State* v. *Jackson*, supra, 95 Conn. App. 414.

accord *State* v. *Haughey*, 124 Conn. App. 58, 61 n.3, 3 A.3d 980 (2010) ("these [disparate treatment] claims were not properly preserved at trial, as defense counsel failed to identify adequately the alleged venire-comparators during or after voir dire").

In the present case, therefore, the disparate treatment claim is not reviewable because the record reveals that it was not preserved. In short, once the prosecutor had accepted any of the jurors whom the defendant claims were similarly situated to D, it was the defendant's burden to renew his *Batson* challenge regarding D based on his claim of disparate treatment. Here, three of the allegedly comparable venirepersons were questioned subsequent to the *Batson* challenge of D's dismissal, and the defendant did not renew the challenge before the jury was sworn so as to include them in the court's consideration of the challenge, as required by *Robinson* and its progeny. Furthermore, even though the voir dire of C was part of the record at the time the court made its finding with regard to D, the defendant failed to raise disparate treatment as a ground for sustaining the *Batson* challenge. Consequently, the court never had the opportunity to consider disparate treatment as part of its assessment of the defendant's *Batson* claim regarding D. Because the claim is unpreserved, it is unreviewable on appeal.[12]

---

Furthermore, because *Robinson* set a strict time frame for *Batson* claims with the express purpose of preserving an adequate record for appeal, an untimely *Batson* claim is not amenable to *Golding* review, which requires an adequate record. See *State* v. *Robinson*, supra, 237 Conn. 252 ("[t]imely objection enables the parties and the trial court . . . to preserve an adequate record for appeal"); *State* v. *Golding*, supra, 213 Conn. 239 ("a defendant can prevail on a claim of constitutional error not preserved at trial only if . . . the record is adequate to review the alleged claim of error"); see also, e.g., *State* v. *Haughey*, 124 Conn. App. 58, 61 n.3, 3 A.3d 980 (2010) (repudiating defendant's contention that *Batson* claims of disparate treatment are reviewable in first instance pursuant to *Golding*).

[12] The defendant also mistakenly asserts that the timely *Batson* claim rule in *Robinson* and *Hodge* was overruled by the decisions of the United States Supreme Court in *Snyder* v. *Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170

## B

Turning now to the defendant's claim that the state's explanation for exercising its peremptory strike on D was insufficient and pretextual, we conclude that the

L. Ed. 2d 175 (2008), *Miller-El* v. *Dretke,* 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005), and *Johnson* v. *California,* 545 U.S. 162, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). In those cases, the court reviewed the entire record to find disparate treatment despite the fact that a disparate treatment claim had not been raised in the trial court. *Miller-El* is distinguishable, however, because the scope of review in that case expressly was defined by the rules of federal habeas procedure, which do not apply here. See *Miller-El* v. *Dretke,* supra, 241 n.2.

*Snyder* and *Johnson* are also procedurally distinguishable. The court in *Snyder* noted that "[i]n *Miller-El* v. *Dretke,* [supra, 545 U.S. 239] the [c]ourt made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder* v. *Louisiana,* supra, 552 U.S. 478; accord *Johnson* v. *California,* supra, 545 U.S. 170 ("we assumed in *Batson* that the trial judge would have the benefit of all relevant circumstances"). While this rule governs our substantive review of a properly preserved constitutional claim of disparate treatment of venirepersons, the preservation of such a claim remains a matter of state procedure. See *Johnson* v. *California,* supra, 168 ("we recognize that States do have flexibility in formulating appropriate procedures to comply with *Batson*"); see also *State* v. *Robinson,* supra, 237 Conn. 246 n.7 ("[t]he United States Supreme Court has expressly not determined the point in time by which a criminal defendant must raise a *Batson* claim"), citing *Ford* v. *Georgia,* 498 U.S. 411, 423, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991) ("we recognized [in *Batson*] that local practices would indicate the proper deadlines in the contexts of the various procedures used to try criminal cases, and . . . left it to the trial courts, with their wide 'variety of jury selection practices,' to implement *Batson* in the first instance").

The following principle, articulated in *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and quoted in *Hodge,* is particularly instructive with regard to the preservation of a constitutional claim: "The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, *or to make factual determinations,* in order to decide the defendant's claim." (Emphasis added.) Id., 240. Because, in the present case, the defendant did not ask the trial court to make a factual determination comparing the state's treatment of D with its treatment of other venirepersons, the disparate treatment claim is unpreserved and unreviewable on appeal.

court's rejection of the defendant's *Batson* challenge was not clearly erroneous. Although the defendant acknowledges that an arrest record constitutes a race neutral ground for a peremptory strike; see *State* v. *Smith*, 222 Conn. 1, 14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); he argues that, for this rule to apply, the arrest record must be tied to the crime and the facts of the case at bar. Our appellate courts, however, have not added such a gloss to the rule in the past. See, e.g., *State* v. *Acosta*, 119 Conn. App. 174, 185–86, 988 A.2d 305 (venireperson arrested on drug charge dismissed from robbery trial), cert. denied, 295 Conn. 923, 991 A.2d 568 (2010); *State* v. *Sells*, 112 Conn. App. 775, 786, 964 A.2d 97 (venireperson convicted of failure to appear dismissed from burglary trial), cert. denied, 291 Conn. 908, 969 A.2d 173 (2009). Moreover, the New Haven police are common to both D's arrest record and the defendant's case; thus, the defendant's suggestive gloss would be unavailing to his claim, regardless.

The defendant also acknowledges that having a close relative who has been prosecuted may constitute a race neutral ground for the exercise of a peremptory strike. See *State* v. *Kendall*, supra, 123 Conn. App. 658. Nevertheless, he argues that the state failed to connect D's experience with his incarcerated son to his potential performance as a juror. Additionally, although the defendant acknowledges that a venireperson's troubled past has been held to constitute a race neutral ground for questioning his or her ability to be impartial; see *State* v. *Hamlett*, 105 Conn. App. 862, 878–79, 939 A.2d 1256, cert. denied, 287 Conn. 901, 947 A.2d 343 (2008); he argues that D's troubled past was so distant, occurring nearly twenty years before, that it would not affect his ability to be impartial. He also claims that the prosecutor's questioning of D was merely perfunctory, given that the information that became the grounds for the

peremptory strike was elicited during defense counsel's voir dire of D, not the prosecutor's voir dire. He asserts that the record in this regard demonstrates an intention on the part of the prosecutor to exercise a peremptory challenge to excuse D even before he began to question him. Finally, he asserts that the prosecutor should have believed D's assurances that he could be impartial.

None of these arguments is availing. "[A] prosecutor is not bound to accept the venireperson's reassurances, but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters." *State v. Hodge,* supra, 248 Conn. 231. Furthermore, as the defendant acknowledges, all of the proffered grounds for the peremptory strike in this case have been approved as race neutral in past cases. We note again that "the fact-bound determination concerning the propriety of the use of peremptory challenges is a matter that necessarily must be entrusted to the sound judgment of the trial court, which, unlike an appellate court, can observe the attorney and the venireperson and assess the attorney's proffered reasons in light of all the relevant circumstances." Id., 261. Based on our review of the record, we find ample support for the court's finding that the prosecutor's use of the peremptory challenge to excuse D was race neutral. We conclude, accordingly, that the court's rejection of the defendant's *Batson* challenge was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.