******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MICHAEL MYERS *v.* COMMISSIONER
OF CORRECTION
(AC 37379)

Keller, Mullins and Kahn, Js.

*Argued October 27, 2015—officially released March 22, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Fuger, J.)

*Jessica Vizvary*, with whom were *Kristi Thomaston*
and, on the brief, *Stephanie M. O'Neil* and *Grayson
Colt Holmes*, for the appellant (petitioner).

*Jacob L. McChesney*, special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Rebecca A. Barry*, assistant state's attorney, for the appellee (respondent).

*Opinion*

KELLER, J. After the habeas court rendered judgment denying his amended petition for a writ of habeas corpus, the petitioner, Michael Myers, brings the present appeal following the denial of his petition for certification to appeal. The petitioner claims that the court abused its discretion in denying his petition for certification to appeal because counsel at his criminal trial rendered ineffective assistance by failing to preserve for appellate review a claim that the state had excluded a potential juror on the basis of race in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We conclude that the court properly exercised its discretion in denying the petition for certification to appeal and, accordingly, dismiss the present appeal.

The relevant procedural history is as follows. In 2008, following a jury trial, the petitioner was convicted of manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55a and 53a-55 (a) (1), carrying a pistol without a permit in violation of General Statutes § 29-35, tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1) and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The court imposed a total effective sentence of fifty years of incarceration. Following a direct appeal, this court affirmed the judgment of conviction. *State* v. *Myers*, 126 Conn. App. 239, 11 A.3d 1100, cert. denied, 300 Conn. 923, 14 A.3d 1006 (2011).

This court set forth the facts underlying the petitioner's conviction, as they reasonably could have been found by the jury, as follows: "The [petitioner] had a tempestuous relationship with Shaquita Alston, the mother of his child. On the night of June 2 and the early morning of June 3, 2005, Alston met the victim, William Corey, at a nightclub in New Haven, after which they had sexual relations at his apartment. Corey then drove her back to her residence, where they found the [petitioner] waiting outside. The [petitioner] advised Corey that he would talk to him later.

"Over the next two days, the [petitioner] argued with Alston, accusing her of having sexual relations with Corey, which she denied. Subsequently, in the early morning of June 5, 2005, she physically attacked the [petitioner] when she saw him with another woman at his house. On the night of June 6, 2005, the [petitioner] and Alston spent time together at his house, during which he telephoned Corey and arranged a meeting. He took a handgun with him when he and Alston left the house.

"The [petitioner] and Alston walked to meet Corey, who was waiting in his car. Both got into Corey's car, which he then drove around New Haven, at which time

the [petitioner] asked questions about what had transpired between Corey and Alston on the morning of June 3. During this time, the [petitioner] also telephoned a friend of Alston who had left the club with her and Corey on June 3. At some point, the [petitioner] directed Corey to stop the car and exited on the passenger side after Alston. Standing outside the car, he fired one gunshot into Corey and ran from the scene. Corey died of internal bleeding caused by the single gunshot wound." Id., 242–43.

Among the several claims raised by the petitioner in his direct appeal was that, at the time of jury selection in his criminal trial, the trial court improperly denied a *Batson* challenge raised by the defense after the prosecutor peremptorily struck D, an African-American venireperson, from the venire panel. Id., 242, 256. The petitioner's claim was in two parts. First, he claimed that the state's acceptance of other venirepersons who were not African-American but were similarly situated to D, specifically, C, F, V, and L, demonstrated that the prosecutor's articulated reasons for striking D were pretextual and that D's dismissal was race based. Id., 256, 260. Second, apart from the issue of disparate treatment of venirepersons by the state, the petitioner claimed that the court erred in concluding that the prosecutor's proffered explanation for striking D was facially based on something other than D's race, and, therefore, was not pretextual. Id., 256, 263.

This court set forth the facts relevant to the *Batson* claims as follows: "During voir dire, the prosecutor and defense counsel both questioned D. In response to the prosecutor's questions, D revealed that he had been arrested by the New Haven police nineteen years earlier but believed that he had been treated fairly because he was innocent and the case had been nolled. He indicated that he did not harbor any bias against the criminal justice system or against police officers. In response to defense counsel's questions, D revealed that his son had been prosecuted and convicted in the Milford court for armed robbery and was serving a twenty year sentence. He stated that he writes to his son but that his son does not write back. He also stated that his son's situation would not affect his impartiality because his son was a grown man and has to live with his decisions. D also revealed that, when he was a young adult in Texas, he 'used to run with a pimp' and once had carried a gun but had not used it.[1] He noted, 'When I did that, I was young, and I've never like[d] it then, I don't like it now.' He also indicated that he had turned his life around since his 'wild' youth.

"After D's voir dire, the prosecutor exercised a peremptory challenge to excuse D, and defense counsel raised a *Batson* objection. The prosecutor articulated three race neutral reasons for exercising his challenge: (1) similar to the [petitioner], D had been arrested by

the New Haven police; (2) his son had been prosecuted by the Milford state's attorney's office, and the prosecutor disclosed that he had formerly worked at that office; and (3) because of D's stated wild youth, there was a possibility that he would empathize with the [petitioner's] circumstances despite his promises of impartiality. Defense counsel responded that these reasons were insufficient because D stated that he was not biased as a result of these experiences, and he demonstrated that he was thoughtful, candid, aware of a juror's responsibilities, and committed to being impartial. The court found that D's experiences created a risk that he might empathize with the [petitioner] and also found that the state had not engaged in a pattern of questioning him that was different from its treatment of other venirepersons. It concluded that there was nothing to suggest that the prosecutor had a race based ulterior motive in exercising a peremptory challenge to excuse D." (Footnote in original.) Id., 258–60.

In the context of the petitioner's direct appeal, this court declined to review his claim that the state's acceptance of other venirepersons whom he argued were similarly situated to D, specifically, C, F, V, and L, demonstrated that the prosecutor's articulated reasons were pretextual and that, in fact, D's dismissal was race based. This court observed that, to substantiate his claim, the petitioner "compare[d] the state's treatment of D to its treatment of two accepted jurors, C and F, and two venirepersons, V and L, who were accepted by the state before they were dismissed by the [petitioner]." Id., 260. Also, the court observed that the state argued that the facts on which the petitioner relied, which pertained to the state's treatment of C, F, V, and L, were not properly before this court in the context of the direct appeal because "they were not before the [trial] court at the time that it made its finding on the [petitioner's] *Batson* challenge. The voir dire of C occurred on March 6; the *Batson* challenge regarding D occurred on March 7; and the voir dire of the other three [venirepersons] took place on March 17 and 20, 2008." Id.

This court, citing relevant precedent, observed that a *Batson* challenge is timely if it is raised at any time before the jury is sworn, a *Batson* claim that is based on a prosecutor's alleged disparate treatment of venirepersons necessitates a comparison of the prosecutor's treatment of venirepersons throughout the process or jury selection, and that "any *Batson* claim not timely raised [before the trial court] is deemed to have been waived." Id., 260–61. This court, declining to review the *Batson* claim that was based upon alleged disparate treatment of venirepersons, stated: "In the present case, therefore, the disparate treatment claim is not reviewable because the record reveals that it was not preserved. In short, once the prosecutor had accepted any of the jurors whom the [petitioner] claims were simi-

larly situated to D, it was the [petitioner's] burden to renew his *Batson* challenge regarding D based on his claim of disparate treatment. Here, three of the allegedly comparable venirepersons were questioned subsequent to the *Batson* challenge of D's dismissal, and the [petitioner] did not renew the challenge before the jury was sworn so as to include them in the court's consideration of the challenge, as required by [*State* v. *Robinson*, 237 Conn. 238, 245–50, 676 A.2d 384 (1996)] and its progeny. Furthermore, even though the voir dire of C was part of the record at the time the court made its finding with regard to D, the [petitioner] failed to raise disparate treatment as a ground for sustaining the *Batson* challenge. Consequently, the court never had the opportunity to consider disparate treatment as part of its assessment of the [petitioner's] *Batson* claim regarding D. Because the claim is unpreserved, it is unreviewable on appeal." *State* v. *Myers*, supra, 126 Conn. App. 262. Thereafter, with respect to the petitioner's separate claim that was based not on whether the state had treated D differently from other similarly situated jurors, but on whether the prosecutor's explanation for excluding D was facially insufficient, this court concluded that there was "ample support" in the record for the trial court's determination that the prosecutor's use of a peremptory challenge was race neutral. Id., 265.

On March 3, 2014, the petitioner, through counsel, filed an amended petition for a writ of habeas corpus. In the sole ground raised in support of the petition, the petitioner alleged in relevant part that his defense counsel from the criminal trial, Attorney Scott Jones and Attorney Mary Haselkamp, had rendered ineffective assistance because before the trial court they had failed to claim with respect to his *Batson* challenge that the state had treated D differently than it had treated similarly situated venirepersons C, F, V, and L, and thereby had failed to preserve for appellate review the disparate treatment claim that he had raised in his direct appeal. Further, he alleged that, but for counsel's deficient representation, "the claim would have been successful on appeal."

The respondent, the Commissioner of Correction, denied the allegation of ineffective assistance of counsel and the allegation that the claim, if properly preserved, would have been resolved in the petitioner's favor on appeal. The habeas court held an evidentiary hearing on the habeas petition on August 28, 2014. At the hearing, the petitioner presented testimony from Attorney James B. Streeto, who represented him during his direct appeal, as well as Jones, one of the two attorneys who represented him during his criminal trial, including during the lengthy jury selection process. Among the items admitted into evidence at the hearing were the transcripts from the voir dire portion of the criminal trial, as well as materials related to the petitioner's direct appeal.

In its memorandum of decision, the habeas court rejected on its merits the petitioner's claim of ineffective assistance of counsel. The court found that the petitioner had proven the historical facts alleged in his petition, which concerned what had transpired during the trial and the direct appeal. The court aptly characterized the only allegations in dispute to be whether the actions of trial counsel were deficient in terms of competent and reasonable representation; whether, but for any deficient performance by counsel, the petitioner would have been successful on appeal; and whether, because of any deficient performance, the petitioner had been deprived of his constitutional right to effective assistance of counsel.

At the outset, we note that the habeas court appears to have assumed for purposes of its analysis that the petitioner's trial counsel had rendered deficient performance by failing to preserve the claim that the prosecutor had engaged in disparate treatment of venirepersons.[2] The court focused its analysis on whether the petitioner had demonstrated that such deficient performance caused him prejudice. The court observed that the petitioner had presented testimony from Jones and Streeto, and chose to rely on the record of the earlier proceedings before the trial court and this court. After setting forth relevant legal principles, the court stated in relevant part: "[A]s a fact finder, given the state of the evidence that was presented to this court, and taking into consideration that the petitioner bears the burden of persuasion, this court cannot and will not conclude that any of the venirepersons received disparate treatment. This court shall specifically find that the critical important fact of the venirepersons [at issue] being 'similarly situated' has not been proven by a preponderance of the evidence. Consequently, the petitioner has failed to show . . . that [he] was prejudiced by the deficient performance of his trial defense counsel." The court denied the petitioner's amended petition for a writ of habeas corpus and, later, it denied the petition for certification to appeal.[3] This appeal followed.

We first address the petitioner's burden in the present appeal. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a differ-

ent manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling . . . [and] [r]eversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *Wilson* v. *Commissioner of Correction*, 150 Conn. App. 53, 56–57, 90 A.3d 328, cert. denied, 312 Conn. 918, 94 A.3d 641 (2014).

Before the habeas court, the petitioner raised a claim of ineffective assistance of trial counsel. "In order to establish an ineffective assistance of counsel claim a petitioner must meet the two-pronged test enunciated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Specifically, the claim must be supported by evidence establishing that (1) counsel's representation fell below an objective standard of reasonableness, *and* (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. . . . Because both prongs of *Strickland* must be demonstrated for the petitioner to prevail, failure to prove either prong is fatal to an ineffective assistance claim. . . . In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Atkins* v. *Commissioner of Correction*, 158 Conn. App. 669, 675, 120 A.3d 513, cert. denied, 319 Conn. 932, 125 A.3d 206 (2015).

The habeas court concluded that the petitioner had failed to demonstrate that he was prejudiced by his trial counsel's failure to preserve a claim based upon disparate treatment of venirepersons. Before this court, the petitioner challenges the propriety of the habeas court's determination, which was fatal to his claim of ineffective assistance, that the venirepersons at issue in his claim were not similarly situated. The petitioner argues in relevant part: "The voir dire transcripts of the petitioner's criminal trial show that D received disparate treatment when he was dismissed by the state as a potential juror because D, a black venireperson, was similarly situated to other white jurors and/or venirepersons C, V, F, and L, all of whom were accepted by the state. Because the transcripts show that D was similarly situated and received disparate treatment when compared to others, there is a reasonable proba-

bility that the petitioner would have prevailed on appeal, had the claim been preserved." In opposition, the respondent argues that the habeas court correctly determined that, under *Batson*, C, V, F, and L were not similarly situated to D and, thus, that the petitioner was unable to demonstrate that he was prejudiced by his counsel's failure to raise the unpreserved *Batson* claim.[4]

Before discussing the merits of the claim, we set forth relevant legal principles. "Voir dire plays a critical function in assuring the criminal defendant that his [or her] [s]ixth [a]mendment right to an impartial jury will be honored. . . . Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. . . . Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine [his or her] fitness to serve on the jury. . . . Because the purpose of voir dire is to discover if there is any likelihood that some prejudice is in the [prospective] juror's mind [that] will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted [to ask] questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. . . . The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause. . . .

"Peremptory challenges are deeply rooted in our nation's jurisprudence and serve as one state-created means to the constitutional end of an impartial jury and a fair trial. . . . [S]uch challenges generally may be based on subjective as well as objective criteria. . . . Nevertheless, [i]n *Batson* [v. *Kentucky*, supra, 476 U.S. 79] . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the [e]qual [p]rotection [c]lause forbids [a party] to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, a *Batson* inquiry involves three steps. First, a party must assert a *Batson* claim . . . . [Second] the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges

are true, the challenges violate the [e]qual [p]rotection [c]lause as a matter of law. . . . At this stage, the court does not evaluate the persuasiveness or plausibility of the proffered explanation but, rather, determines only its facial validity—that is, whether the reason on its face, is based on something other than the race of the juror. . . . Thus, even if the [s]tate produces only a frivolous or utterly nonsensical justification for its strike, the case does not end—it merely proceeds to step three. . . .

"In the third step, the burden shifts to the party asserting the *Batson* objection to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . In evaluating pretext, the court must assess the persuasiveness of the proffered explanation and whether the party exercising the challenge was, in fact, motivated by race. . . . Thus, although an improbable explanation might pass muster under the second step, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination at the third stage of the inquiry. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race . . . were asked a question to elicit a particular response that was not asked of other jurors . . . (4) persons with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race . . . .

"In deciding the ultimate issue of discriminatory intent, the [court] is entitled to assess each explanation in light of all the other evidence relevant to [a party's] intent. The [court] may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . . Ultimately, the party asserting the *Batson* claim carries the . . . burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"The second step of the *Batson* inquiry involves a determination of whether the party's proffered explanation is facially race neutral and, thus, is a question of law. . . . Because this inquiry involves a matter of law, we exercise plenary review. . . .

"The third *Batson* step, however, requires the court to determine if the prosecutor's proffered race neutral explanation is pretextual. . . . Deference [to the trial court's findings of credibility] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations. . . . Whether pretext exists is a factual question, and, therefore, we shall not disturb the trial court's finding unless it is clearly erroneous." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Edwards*, 314 Conn. 465, 483–90, 102 A.3d 52 (2014).

At the time of trial, the petitioner asserted a *Batson* claim, and the prosecutor advanced what the court determined to be a facially race neutral explanation for the removal of D. In the petitioner's direct appeal, this court rejected his claim that, on its face, the prosecutor's explanation for striking D from the venire panel improperly was based on race. In his habeas petition, the petitioner sought to demonstrate that he would have prevailed on appeal but for his trial counsel's failure to take the next step in the *Batson* challenge. Specifically, he argues that counsel failed to demonstrate that the facially race neutral explanation was pretextual because the prosecutor had accepted C, F, V, and L, whom he characterizes as persons similarly situated to D, but not of the same race as D.

Thus, the dispositive issue is whether, as the petitioner argues, C, F, V, and L were similarly situated to D. If, apart from race, they did not have the same or similar characteristics as D, the petitioner is unable to demonstrate that he suffered any prejudice as a result of the alleged deficient performance of his trial counsel. Previously in this opinion, we discussed the facts elicited during the voir dire examination of D. Now, we will review the evidence to which the petitioner draws our attention concerning C, V, L, and F, as he attempts to demonstrate that these venirepersons, all of whom were accepted by the state following their voir dire examinations, were similarly situated to D. We observe that the evidence concerning the voir dire examinations of these venirepersons is not in dispute.

There was evidence before the habeas court that C was a white male. As relevant, C testified during his voir dire examination that when he lived in New York several years earlier, he was a crime victim when his apartment was broken into and his car was stolen. Apart from this testimony, C testified that later, when he was living in Connecticut, he had been charged with driving

under the influence, he had gone "through the process," and the charge had been dismissed. C testified that it was a "pretty humiliating experience," one that he did not want to go through again. C testified that he did not know anyone else who had been arrested or accused of a crime. C testified that nothing about his dealings with the police or the legal system left him with bad feelings, and that the experience would not affect his ability to be a fair and impartial juror.

There was evidence before the habeas court that V was female and not an African-American. In response to questioning by the prosecutor during her voir dire examination, V testified that prior to her current employment, she had been employed by a specific motorcycle dealership for seven and one-half years. The prosecutor explained the reasons for his inquiry into her prior employment: "The only reason I asked you is, that I had gone out there. There was a case out there that I was involved in personally, and I know I met some of the people that worked there." The prosecutor stated that he did not recall having met V. V testified that she had not met the prosecutor and that she did not know anything about that case related to the motorcycle dealership. Moreover, V testified that nothing about that incident would cause her to favor one side or the other in the present case. Later, V testified that she had no personal involvement in the criminal justice system and that no family or friends of hers had ever been accused of committing a crime.

With respect to L, a female venireperson, there was evidence that she was not an African-American. L testified during her voir dire examination by the prosecutor that she did not know anyone who had any involvement in the criminal justice system. Later, during examination by defense counsel, L testified that eight or nine years earlier, after one of her sons graduated from college, he had "had a DUI." L testified that her son had to appear in court, but that she "really wasn't involved [in the case]." L testified that her son was not happy about the incident and that she was not impacted by the incident.

There was evidence that F was a white male. F testified during his voir dire examination that, as a consequence of a recent charge of driving under the influence, he was scheduled to appear before the court in a nearby courthouse. He stated that he was represented by an attorney and expected to "find out about classes" at his next court appearance. F testified that he did not believe that that pending matter would affect his ability to be a fair and impartial juror. F testified that the driving under the influence incident occurred in Madison, and that, in connection with the incident, he believed that he had been "treated professionally . . . ." He stated: "I made a mistake and, you know, so, I have to suffer the consequences. It's something

I'll never do again. . . . It wasn't planned, it was just, you know, kind of like an accident. . . . Unfortunately, I can't go back, I can only go forward." He stated that the driving under the influence charge was his only involvement with the criminal justice system, and that no other friends or family members of his had had any involvement in the criminal justice system.

Our jurisprudence does not furnish us with a ready test by which to determine whether "persons with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . ." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 314 Conn. 486. The United States Supreme Court has observed that, to prevail under this type of *Batson* claim, a defendant need not demonstrate the impossible by proving that accepted jurors were identical *in all respects* to one or more excluded jurors of a different race. The court stated: "A per se rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." (Emphasis omitted.) *Miller-El* v. *Dretke*, 545 U.S. 231, 247 n.6, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005). In an analysis of this nature, it is useful to consider, among other relevant factors, whether the reasons proffered by the prosecutor for striking the excluded juror or jurors logically applied to the jurors accepted by the state. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." Id., 241. This is the focus of the petitioner's arguments before this court.

In the present case, the petitioner attempts to draw similarities between D and C, V, L, and F. Yet, an examination of the facts on which he relies does not demonstrate that any of these venirepersons were similarly situated to D. As a preliminary matter, one of the race neutral reasons articulated by the prosecutor for striking D was that D had indicated that he had acted in a "wild" manner in his younger days. D explained that he had been arrested by the New Haven police nineteen years earlier, had been in a situation in which he was armed with a gun in the context of a dispute in Texas, and "[ran] with a pimp . . . ." During his examination, D portrayed himself as someone who, recognizing that he no longer wanted to be part of a criminal lifestyle, had turned his life around. He stated in relevant part: "I walk a different path now. . . . [W]hen I was younger I may have been doing other things like that, you know, but now I'm just straightforward . . . and I try to do right." As set forth previously, the prosecutor expressed his concern that D, who was forty-six years of age, might empathize with the petitioner, a young man who was accused of engaging in criminal activity involving

the use of a gun. Neither C, V, L, nor F had testified that they had a similar type of "wild" youth and subsequent maturation process. Thus, none of these other venirepersons posed the same type of risk of empathizing with the petitioner and, perhaps, a desire to afford him a second chance.

The prosecutor expressed his race neutral concern that, like the petitioner, D had been arrested by the New Haven police. The petitioner attempts to demonstrate that D's arrest made him similarly situated to C, who had been charged with driving while under the influence, and F, who at the time of his examination was addressing a charge of driving while under the influence arising from an incident in Madison. For several reasons, the petitioner's argument is unavailing.

Implicit in the prosecutor's explanation concerning D's prior arrest by the New Haven police was that it might cause him to harbor a bias against the New Haven police, in particular. This was a significant concern in the present case because the petitioner was arrested by the New Haven police. There was no indication in the evidence, however, that C or F had been arrested by the New Haven police. Thus, D's testimony gave rise to concerns that did not arise from the testimony of C or F. Moreover, contrary to the petitioner's arguments, D and F were not similarly situated simply because both venirepersons had faced pending charges in the *New Haven judicial district*. As stated previously, the testimony elicited during the voir dire examinations demonstrated that F, unlike D, had been arrested by the Madison police.

Also, any attempt by the petitioner to draw parallels from the fact that D, C, and F all had been arrested is unavailing because of the testimony concerning the differences surrounding these arrests. D testified that his arrest occurred in 1989, when he was "in a car with some drugs." He stated that the New Haven police stopped the automobile, discovered drugs under the seat, and "arrested everybody in the car." D testified that, ultimately, one of the occupants confessed that the drugs belonged to him, and that the charges brought against D and the remaining two occupants of the automobile had been nolled. Although D testified that he believed he had been treated fairly, he stated: "I felt comfortable that I didn't do anything . . . ." He agreed with the prosecutor's characterization of the event as a "bad experience" for him. Apart from the fact that D, C, and L, had a history of arrest, the testimony reflects that D had been arrested for a drug related offense and that C and L had been arrested for an offense of a different nature, driving while under the influence of alcohol. Moreover, D testified that his experience in being arrested by the New Haven police was a bad experience, that he was not guilty of any wrongdoing, and that the police simply had arrested him because of

his presence in an automobile in which drugs were found. In contrast, during their testimony, although C and L described their arrests as humiliating and unfortunate experiences, C and L did not characterize their arrests as bad experiences, or suggest that they had not been guilty of any wrongdoing in connection with the arrests. C testified that the charge against him had been dismissed. F, similarly, testified that he had a pending charge, but his testimony suggested his belief that it would be dismissed once he attended classes. Because it is reasonable to conclude that D's arrest was more of a negative encounter with the police than were the arrests of C or F, the petitioner is unable to demonstrate that D, C, and F were similarly situated simply because of their history of arrest. "Prosecutors commonly seek to exclude from juries all individuals, whatever their race, who have had negative encounters with the police because they fear that such people will be biased against the government." (Internal quotation marks omitted.) *State* v. *Kalican,* 110 Conn. App. 743, 759, 955 A.2d 1261, cert. denied, 289 Conn. 949, 960 A.2d 1038 (2008).

Additionally, the petitioner refers to the prosecutor's race neutral explanation that he had exercised a peremptory challenge with respect to D for reasons related to the fact that, formerly, the prosecutor was employed in the Milford state's attorney's office, and D's son, who was serving a lengthy term of incarceration following a conviction for armed robbery, had been prosecuted by that office.[5] The petitioner attempts to draw a parallel between D, whose son was prosecuted by an office where the prosecutor formerly was employed, and V, who testified that she formerly was employed by a motorcycle dealership, one that had been the subject of an investigation by the prosecutor. The petitioner overlooks the fact that V testified that she was completely unaware of the investigation of her former employer about which the prosecutor inquired. In contrast, D testified that his son had been arrested for an armed robbery in West Haven and that he had been prosecuted in Milford. The record, including the representations of the prosecutor during his colloquy with V, reflects that the prosecutor had been involved in an investigation of V's *former employer*. In contrast, D testified that a close family relative, his *son*, had been arrested, prosecuted, and sentenced in "the Milford court" to a twenty year term of imprisonment for armed robbery. Accordingly, the petitioner is unable to demonstrate that D and V were similarly situated in this regard.

Finally, the petitioner attempts to demonstrate that D and L were similarly situated because D and L both had sons who had been arrested. As a preliminary matter, in contrast to the prosecution of D's son, there was no indication in the evidence that the prosecutor or an office in which he had been employed was in any way involved in the arrest of L's son. More importantly,

however, the evidence demonstrated that L's son was arrested and charged with driving while under the influence of alcohol. L testified that she was not involved in the matter, but merely recalled that her son had to appear in court. There was no indication that L's son had been sentenced to serve any period of incarceration. A fair interpretation of L's testimony as a whole suggests that the matter was not memorable to her. In contrast, D's son was convicted of armed robbery and was serving a lengthy, twenty year prison sentence. It is obvious, therefore, that the arrest of D's son and the arrest of L's son were for very different types of crimes and led to outcomes that were vastly different. Thus, the petitioner is unable to demonstrate, on the basis of these arrests, that D and L were similarly situated.

We recognize that the perception of racial bias by the state in jury selection "invites cynicism respecting the jury's neutrality" and that such bias in jury selection is an "overt wrong . . . [that] casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause." *Powers* v. *Ohio*, 499 U.S. 400, 412, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). After a careful review of the arguments and record presented to this court, however, we conclude that the petitioner has not demonstrated that D was similarly situated to C, V, L, or F, and, therefore, he is unable to demonstrate that, had his trial counsel attempted to demonstrate that the prosecutor's articulated reasons for excluding D were pretextual on the ground that C, V, L, or F were similarly situated to D, it was reasonably probable that the outcome of his appeal would have been different.

In light of the foregoing, we conclude that the issue of whether the petitioner was prejudiced by the alleged deficient representation of his trial counsel was not debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions involved are adequate to deserve encouragement to proceed further. Accordingly, we conclude that the court properly exercised its discretion in denying the petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] "D stated the following: 'When I was in Texas about sixteen years ago, I used to run with a pimp. All right. And we was at a club and one of his girls came in, and this guy was trying to run him over downtown, so we ran over with the pimp's girl downtown. . . . So, then we went to the car, we popped the trunk and started pulling out guns. Well, I'm petrified, you know, so we riding and I'm praying that we never run up on this person. . . . And we never did.'" *State* v. *Myers*, supra, 126 Conn. App. 259 n.10.

[2] We observe that, although the habeas court did not find explicitly that defense counsel had performed deficiently, it stated that this court, in its prior opinion concerning the claims raised in the direct appeal, "all but makes that finding mandatory." We disagree with such interpretation of this court's prior opinion. This court, in its prior opinion, did not make any determination with respect to whether the petitioner's trial counsel had acted deficiently, nor did it suggest that such a determination was proper. Rather, this court merely observed that defense counsel had not raised the

claim at issue.

We do not know of any authority that stands for the proposition that counsel's mere failure to raise a claim of this nature constitutes deficient performance as a matter of law. It is the petitioner's burden to demonstrate that counsel's challenged acts or omissions constituted deficient performance. Here, Jones testified at the habeas trial that he did not raise the claim of disparate treatment because "[i]t didn't seem like there was a need to do so" and he "didn't want to engage in any frivolous claims." Whether Jones' tactical decision in this regard fell below an objective standard of reasonable competence is an issue that has not been the subject of judicial scrutiny before this court.

Accordingly, we disagree with the habeas court that this court's prior recitation of the procedural history underlying the claim suggests that counsel's conduct in failing to raise the claim was the product of representation that fell below an objective standard of reasonableness. A court deciding a claim of ineffective assistance of counsel need not resolve the question of deficient performance if it is able to reject the claim solely on the ground of lack of prejudice. See *Nardini* v. *Manson*, 207 Conn. 118, 124, 540 A.2d 69 (1988). Because, in the present appeal, we agree with the habeas court that the petitioner failed to demonstrate that he was prejudiced by the performance of trial counsel, we uphold its denial of certification to appeal without resolving the question of deficient performance.

[3] Among the grounds set forth by the petitioner in support of his petition for certification to appeal from the judgment of the habeas court was that the court erroneously found that the venirepersons at issue were not similarly situated and had not received disparate treatment. Thus, in his petition for certification to appeal, the petitioner properly alerted the court to the claim that he has presented in the present appeal.

[4] The respondent asserts that the petitioner has "focus[ed] on the wrong proceeding" by couching his habeas petition and his argument before this court concerning prejudice in terms of whether he would have prevailed *in his direct appeal*, rather than focusing on whether ineffective representation deprived him of *a fair trial*. The respondent does not argue, however, that this fact precludes review or that it is dispositive of the claim, but that we should focus our analysis on whether the alleged ineffective assistance deprived him of *a fair trial*. The petitioner alleged in his amended petition that he was prejudiced in that the unpreserved claim "would have been successful on appeal," and claims before this court that he was prejudiced because his trial counsel "failed to preserve the disparate treatment argument for appeal . . . ." The habeas court appears to have addressed the issue of prejudice in more general terms, concluding that "the petitioner has failed to show . . . that [he] was prejudiced by the deficient performance of his trial defense counsel."

The petitioner responds that, as a matter of law, it was proper for him to focus his claim on whether the ineffectiveness of his trial counsel caused him prejudice with respect to the outcome of his direct appeal, by arguing that it deprived him of his ability to prevail in that appeal. In this regard, the petitioner draws our attention to *Young* v. *Commissioner of Correction*, 120 Conn. App. 359, 362, 991 A.2d 685, cert. denied, 297 Conn. 905, 995 A.2d 635 (2010), in which a similar claim was argued before this court in this manner. We observe that, in *Young*, this court affirmed the judgment of the habeas court after concluding that the record supported its determination that the petitioner had failed to demonstrate that his trial counsel had performed deficiently. Id., 369–70.

Because we agree with the habeas court that the petitioner's *Batson* claim lacks merit, the petitioner is unable to demonstrate that he was prejudiced in any manner by his trial counsel's representation. Thus, it is immaterial to our resolution of the claim that he has framed his argument concerning prejudice in terms of the outcome of his direct appeal rather than whether the alleged ineffective representation deprived him of a fair trial.

[5] Although the petitioner asserts before this court that the prosecutor was not employed by the Milford state's attorney's office at the time that D's son was prosecuted by that office, that assertion is not supported by the record. The prosecutor, addressing the court, stated that he "formerly worked for" the Milford state's attorney's office.